**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

RHONDA KAY WHITE,

     *Plaintiff*,

CASE NO. 4:14-cv-11492

*v.*

DISTRICT JUDGE TERRENCE G. BERG
MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

     *Defendant*.

_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that White's Motion for Summary Judgment (Doc. 19) be **DENIED** and that the Commissioner's Motion for Summary Judgment (Doc. 22) be **GRANTED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff's claims for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act 42 U.S.C. § 401-34 and Supplemental Security Income ("SSI") under Title XVI, 42 U.S.C. § 1381 *et seq*. (Doc. 12; Tr. at 614, 726-34). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 19, 22).

Plaintiff Rhonda White ("White") was forty two years old when she protectively applied for benefits on September 7, 2011, alleging that she became disabled on November 15, 2010. (Tr. at 634, 726). This application was denied on November 29, 2011. (Tr. at 652-64). White requested a hearing before an Administrative Law Judge ("ALJ"), which took place on December 14, 2012, before ALJ Donald G. D'Amato. (Tr. at 608-10, 631-51). White, who was represented by attorney Kenneth Clayton, testified, as did vocational expert ("VE") Luann Castellana. (Tr. at 614). On December 14, 2012, the ALJ issued a written decision in which he found White not disabled. (Tr. at 614-27).

The ALJ's decision became the final decision of the Commissioner on February 12, 2014, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), when, after review of additional exhibits,[1] (Tr. at 771-76, 1005-15), the Appeals Council denied Plaintiff's request for review. (Tr. at 1-5). The Appeals Council noted that in addition to the Appeals Council Exhibits, the Council also reviewed the attorney supplied evidence that corresponded to White's treatment in 2013. (Tr. at 2, 8-600). The Council noted that "[t]his new information is about a later time. Therefore, it does not affect the decision about whether you were disabled beginning on or before December 14, 2012," the date of the ALJ's decision. (Tr. at 2). White filed for judicial review of the final decision on April 13, 2014. (Doc. 1).

## B.    Standard of Review

---

[1] In the Sixth Circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

## C.    Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The

Commissioner's regulations provide that disability is to be determined through the application

of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534

(6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and

severity of limitations caused by her impairments and the fact that she is precluded from

performing her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir.

2003). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540 (6th Cir. 2007). The burden

transfers to the Commissioner if the analysis reaches the fifth step without a finding that the

claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At

4

the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ found White was not disabled under the Act. The ALJ found at Step One that White met the insured status requirements through December 31, 2015, and that she had not engaged in substantial gainful activity since November 15, 2010, the alleged onset date. (Tr. at 616). At Step Two, the ALJ concluded Plaintiff had the following severe impairments: "degenerative disc disease of the cervical spine causing central stenosis with radicular pain; status post anterior cervical decompression fusion; bilateral carpal tunnel syndrome, status post right release; right shoulder impingement; bilateral knee pain with meniscular tear; bipolar disorder; history of alcohol abuse; anxiety disorder, not otherwise specified; lumbar disorder; and history of syncope and vertigo." (Tr. at 616). At Step Three, the ALJ found that Plaintiff's combination of impairments did not meet or equal one of the listings in the regulations. (Tr. at 617-18). The ALJ then found that White had the residual functional capacity ("RFC") to perform a limited range of sedentary work

> which is simple and unskilled, with one, two, or three step instructions, occasionally in close proximity to coworkers and supervisors (meaning that the claimant can occasionally function as a member of a team); occasionally in direct contact with the public, in a 'low stress' environment defined as having only occasional changes in the work setting. The claimant can lift and/or carry five pounds frequently, and 10 pounds occasionally. The claimant can stand and/or walk, with normal breaks, for a total of two hours in an eight-hour workday; but can do so for only one-half hour at a time.

The claimant can sit, with normal breaks, for a total of six hours in an eight-hour workday; but can do so for only one-half hour at a time. The claimant can perform pushing and pulling motions with the upper and lower extremities within the aforementioned weight restrictions, for up to two-thirds of a workday. The claimant should have no more than occasional overhead reaching with the right upper extremity. The claimant can perform activities requiring bilateral manual dexterity for both gross and fine manipulations with handling and reaching for up to two-thirds of an eight-hour workday. The claimant needs to avoid hazards in the workplace, such as moving machinery and unprotected heights. The claimant needs to avoid vibrations. The claimant needs to be restricted to a work environment, with stable temperatures, stable humidity, and good ventilation, The claimant can perform each of the following postural activities occasionally: climbing stairs with handrails, balancing, stooping, crouching, kneeling, and crawling, but who needs to avoid climbing ladders, scaffolds, and ropes.

(Tr. at 618-19). At Step Four, the ALJ found that White was unable to perform her past relevant work as a fast food worker, letter carrier, or floor maintenance worker. (Tr. at 625-26). At Step Five, the ALJ found that a significant number of jobs existed which White could perform despite her limitations. (Tr. at 625-27). The ALJ also found that Plaintiff was 41 and therefore a younger individual (age 18-44) as of the alleged onset date. (Tr. at 626). As a result, the ALJ found White is not disabled under the Act. (Tr. at 627).

### E.  Administrative Record

As indicated earlier, the relevant evidence is limited to the evidence before the ALJ, and thus, will be limited to evidence predating the hearing date, i.e., September 19, 2012.

With respect to mental health issues, White was treated at Advanced Counseling Services, P.C., throughout 2011 and 2012. (Tr. at 777-88, 824-31, 961-88). On January 6, 2011, White reported "depression, stress, [and] anxiety" stemming from "long term issues with health dating back to 2009? car accident while on [the] job." (Tr. at 778). As to assessment of

6

relationships, it was noted that White has five children (ages 16-24 at the time) and that she "has friends" and "socializes and gets out." (*Id.*) It was also noted that White was "not on meds as of 1-3-11" (Tr. at 779). White was diagnosed with depression. (Tr. at 780). On January 11, 2011, it was noted that Plaintiff "cried throughout session" and that she had "feelings of anger due to demands/lack of assistance from supervisor" at the post office where she worked at the time. (Tr. at 777). On October 14, 2011, it was noted that White's socioeconomic status and financial factors were relevant to her symptoms because of her "problems with job" and "no $ coming in presently," causing her "extreme stress" due to "feel[ing] harassed by [her] superior" at work. (Tr. at 783, 978).

When examined by her physicians, White was consistently noted to be "oriented x3." (Tr. at 793, 795, 801, 826, 833, 836, 841, 851, 866, 994, 1004). On October 3, 2011, Plaintiff's condition was noted as "improved" because she was "more 'mellow.'" (Tr. at 838).On November 4, 2011, White's attire was appropriate, her motor activity was agitated and hyperactive, her speech was normal, her affect was labile and depressed, but her thought processes and content were unremarkable, her judgment was adequate, and her IQ was estimated as average. (Tr. at 825-26). Although White's sister committed suicide, White herself exhibited no suicidal thoughts or plans. (Tr. at 826).

On April 20, 2012, after having seen Plaintiff twice (Tr. at 964), Dr. T. Abbasi. M.D. completed a mental capacities evaluation assessment wherein he circled "severe" after each and every question regarding Plaintiff's abilities. (Tr. at 961-63). Dr. Abbasi commented only that Plaintiff is "totally disabled." (Tr. at 964).

As to physical issues, White was treated at the POH Medical Center from 2010 to 2011 (Tr. at 789-821), and with Dr. David B. Pinelli, D.O., from 2010 through 2012. (Tr. at 832-960, 989-97.) After having been involved in a car accident in 2003 while delivering mail, Plaintiff was most often treated for upper extremity (shoulder), neck, and back pain. (Tr. at 796, 798, 800, 850, 865).

On December 9, 2010, a nerve conduction study (EMG) showed "findings [that] are consistent with bilateral median nerve mononeuropathy of the wrist and suggestive of mild bilateral carpal tunnel syndrome, predominantly sensory and demyelinative, greater on the right comparing to the left. Those findings explain the patient's presentation with numbness and tingling in the hands." (Tr. at 815, 932). On December 16, 2010, an MRI of the right shoulder was "within normal limits and previous findings suggesting mild tendinosis no longer detected." (Tr. at 813, 930).

On January 4, 2011, it was noted that Plaintiff was "very" anxious and the doctor questioned whether White was bipolar by writing "?bipolar?" (Tr. at 800). On January 8, 2011, an MRI of the cervical spine showed "[d]egenerative disc disease causing central canal stenosis at the levels of C4-5, C5-6, and C6-7" and "Levoconvexity of the cervical thoracic junction." (Tr. at 803, 811, 880, 951, 953). On January 17, 2011, White exhibited "mild" distress and examination of her upper extremities was normal. (Tr. at 798). On February 11, 2011, despite her reported neck and back pain, White's neck and back were "normal" on inspection. (Tr. at 796).

On January 31, 2011, Dr. Jeffrey Gorosh, D.O. diagnosed carpal tunnel syndrome. (Tr. at 917, 921, 922, 924). On March 31, 2011, White was treated for "near syncope – dizzy syncope." (Tr. at 794, 855).

On April 21, 2011, Plaintiff was examined by P.A. Sara Wierzbicki, of Dr. Michael Donahue's office. (Tr. at 882-83, 912-13). White's upper extremities showed intact motion, 5/5 muscle strength, but weakness of the right deltoid of 3/5 and right grip 4/5. (Tr. at 882). Sensation was normal and equal bilaterally and there were no signs of swelling or adenopathy. (*Id*.). Ms. Wierzbicki opined that White's symptoms were caused by the 2003 car accident since she was "pain free prior to the car accident on 12-05-2003." (Tr. at 883, 913). White was considered a "good candidate for epidural injections of C4-5, C5-6 and C6-7." (*Id*.).

A chest x-ray taken on August 1, 2011 was "normal." (Tr. at 802, 877). On August 18, 2011, Dr. Donahue recommended surgery and on August 24, 2011, White  underwent  cervical spine surgery, i.e., anterior cervical decompression and fusion of C4-5, C5-6, and C6-7. (Tr. at 893-94, 900). By October 4, 2011, was "healing well[,]" and demonstrated a strong grip, 5/5 muscle strength, and normal sensation bilaterally in her upper extremities. (Tr. at 822, 897, 902). Although muscle strength in her lower extremities was 5/5, Plaintiff was noted to report knee pain in the medial aspect of the right knee. (*Id*.). Dr. Donahue recommended physical therapy. (*Id*.).

Plaintiff sought confirmation from her doctor that she could not return to work several times. (Tr. at 862, 863, 864). After having written several letters indicating Plaintiff's need to be off work for surgery, on November 2, 1011, Dr. Pinelli wrote a letter opining that White was not able to "work in her usual occupation due to the nature of her work." (Tr. at 934).

On September 19, 2011, Dr. Paul Siatczynski, M.D., examined Plaintiff for knee pain. Dr. Siatczynski reviewed x-rays of White's knees and indicated that "[j]oint space and alignment of both the right and left knee look okay on both the AP and the PA 45" and that all views of the left and right knees were "unremarkable." (Tr. at 896). Ranges of motion of White's lower extremities were "fine" and "unremarkable." (*Id.*).

An MRI of White's knees taken on October 24, 2011, showed a "radial tear of the posterior horn of the right medial meniscus" and post-surgical appearance of the left knee. (Tr. at 885-86).

On November 8, 2011, Dr. Donahue examined White, noted that she had healed well from her cervical spine surgery and that White reported she was "quite pleased" and that her balance and coordination were improving. (Tr. at 891). On November 9, 2011, White was examined by Dr. Siatczynski for follow up on her knee and shoulder problems. (Tr. at 892). Dr. Siatczynski noted that cortisone shots had not helped her right shoulder pain, "but active motion in the office is 90 degrees to 100 degrees, passive not much higher, limited by pain." (Tr. at 892). Dr. Siatczynski reviewed the results of an MRI of White's shoulder taken on December 16, 2010 and noted that he "d[id] not see any significant abnormalities." (*Id.*).

On November 28, 2011, Dr. Gorosh noted that White was "doing well" post-operatively from open carpal tunnel release surgery on her right wrist. (Tr. at 927). White had "good strength and range-of-motion" and Dr. Gorosh indicated that "[f]ormal therapy is not likely to be necessary in this patient." (*Id.*). On January 16, 2012, Dr. Gorosh noted that White was "doing quite well in her post-operative rehabilitation[,]" that her "strength and range of motion

are improving," and that her "carpal tunnel symptoms have resolved." (Tr. at 996). No further treatment was recommended.

On April 20, 2012, Plaintiff complained of "neck stiffness." (Tr. at 993). On June 29, 2012, White reported that "since surgery she has not had any improvement of her pain to the upper extremities, left greater than right." (Tr. at 998). However, review of x-rays taken that day showed post-surgical changes but "no real significant bony growth in the cages" and "good" alignment. (*Id.*). P.A. Wierzbicki stated that images of the lumbar spine and the pelvis showed "good alignment of the lumbar spine with normal disk height. No facet arthritis noted or other abnormalities." (*Id.*). Her reading of the images was confirmed; the MRI of the thoracic spine was "unremarkable" and the MRI of the lumbar spine was "unremarkable." (Tr. at 1000-01.) "[M]arginal spurring bilaterally at C5-6 causing mild narrowing of the neural foramina" was noted as to the cervical spine. (Tr. at 1002).

On August 17, 2012, Dr. Pinelli completed a physical capacities evaluation assessment form. (Tr. at 989-92). Dr. Pinelli opined that White could sit for 4 hours and stand or walk for 2 hours continuously in an 8 hour workday. (Tr. at 989). Dr. Panelli recommended that Plaintiff could lift up to 20 pounds occasionally, could grasp and perform fine manipulation with both right and left upper extremities (Tr. at 990), but that Plaintiff needed freedom to rest and to lie down, citing Plaintiff's diagnoses of cervical disc disease, knee pain, and carpal tunnel syndrome as the "objective medical evidence to support [his] diagnosis and findings[.]" (Tr. at 991).

On September 25, 2012, Dr. Donahue stated that "[w]ith regard to the anatomy of her spine, it appears to be satisfactory and we suggest other etiologies of her pain." (Tr. at 1004).

11

At the hearing before the ALJ, White testified that her pain 'stays about a 7 or 8 daily."
(Tr. at 640). Plaintiff stated that she can "only usually sit for an hour or so" at a time. (*Id.*).
White also testified that she is "usually up about, when I stand up I can usually stand up about,
I don't know, about an hour, but then I have to lay back down because then my head will go to
hurting and everything, I feel like there's a bowling ball on my shoulders." (Tr. at 641).
Plaintiff indicated that she "do[es]n't walk very much because my balance is still off" and that
she has to use two hands to lift and carry a gallon of milk. (*Id.*). Plaintiff added that her
"[a]rms, hands, everything goes, like, real cold and numb." (Tr. at 642). Plaintiff also described
her depression and bi-polar symptoms: "I don't think. I can't focus. I can't remember, and
every now and then I'll, you know, jump at somebody basically for no reason." (*Id.*).

The ALJ asked the vocational expert ("VE") to consider an individual with Plaintiff's
background who

> Requires work which is simple and unskilled with one, two, or three step
> instructions. Occasionally in close proximity to co-workers and supervisors
> meaning the individual can occasionally function as a member of the team.
> Occasionally in direct contact with the public and a low stress environment.
> Defined as only having only occasional changes in the work setting. Can
> lift or carry five pounds frequently and ten pounds occasionally. Can stand
> or walk with normal breaks for a total of two hours in the eight hour
> workday can do so for only half hour at one time. Can sit with normal
> breaks for a total of six hours in an eight hour work day. Can do so with
> only half hour at one time. Drop responsibilities should be such that they
> may be performed with the turning of the torso rather than the neck. Can
> perform pushing and pulling motions would be upper extremities within the
> aforementioned break restriction for up to two thirds of a work day, I'm
> sorry, can perform pushing and pulling motions with the upper and lower
> extremities within the aforementioned weight restrictions for up to two
> thirds of a work day. No more than occasional overhead reaching with the
> right upper extremity. Can perform actives [sic] that require bilateral
> manual dexterity for both gross and fine manipulation of handling and
> reaching for up to two thirds of a work day. Needs to avoid hazards in the

> workplace such as moving machinery and un-protective heights. Needs to avoid vibrations. Needs to restrict to a work environment with stable temperatures, stable humidity, and good ventilation. Can perform each of the following posture actives [sic] occasionally: climbing stairs with handrails, balance, and stoop, crouch, kneeling, and crawling, but needs to avoid climbing ladders, scaffolds, and ropes.

(Tr. at 648-49). The VE responded that such an individual could not perform any of Plaintiff's past relevant work but could perform the 1,000 sorter jobs, the 1,000 packager jobs, and the 1,000 surveillance monitor jobs available in Southeastern Michigan. (Tr. at 649.)

## F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, but the only relevant distinction for present purposes is between "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2. Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions"

13

are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her residual functional capacity. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544. *See also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse*, 502 F.3d at 540-42; SSR 06-3p, 2006 WL 2329939, at *2.

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's residual functional capacity ("RFC"), and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2). *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner*, 375 F.3d at 390.

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of

the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quotation omitted), a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)      [D]aily activities;

(ii)     The location, duration, frequency, and intensity of . . . pain;

(iii)    Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)     Treatment, other than medication, . . . received for relief of . . . pain;

(vi)    Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to step five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

G.    **Analysis**

White contends that the ALJ erred in reaching an erroneous RFC determination and an improper hypothetical by: (1) failing to give adequate consideration to the August 2012 opinions of Dr. Pinelli; (2) failing to consider the combined effects of Plaintiff's multiple conditions, and (3) performing an inadequate credibility determination. The Court addresses these arguments in turn.

White asserts that the ALJ improperly discounted Dr. Pinelli's opinion of August 2012 which, if properly viewed, would support a finding of disability. (Doc. 19 at ID 1094-95). The

17

ALJ assigned "highly limited weight to the August 2012 opinion of Dr. Pinello." (Tr. at 624).[2]
The ALJ based this limitation not only on its contrast to Dr. Pinelli's opinion of 2011 but also
based on the noted "improvement following cervical spine surgery, the lack of objective
medical evidence confirming radicular symptoms, minimal ongoing treatment for the
claimant's shoulder and knee, and evidence of only mild carpal tunnel syndrome with
improvement following right carpal tunnel release." (*Id.*).

Even with the limited weight assigned, the RFC is largely consistent with Dr. Pinelli's
assessment, other than the RFC did not include the conclusion that Plaintiff would need the
freedom to rest and lie down at any time. (Tr. at 989-92). Dr. Pinelli opined that White could
sit for 4 hours and stand or walk for 2 hours continuously in an 8 hour workday. (Tr. at 989).
This is consistent with the ALJ's RFC findings as reflected in the hypothetical that White "can
stand or walk with normal breaks for a total of two hours in the eight hour workday can do so
for only half hour at one time. Can sit with normal breaks for a total of six hours in an eight
hour work day. Can do so with only half hour at one time." (Tr. at 648). The only difference is
that although Dr. Pinelli stated Plaintiff could sit for four hours, the ALJ found she could do so
for six. The ALJ incorporated Plaintiff's need to change her position every half hour which
differs from Dr. Pinelli's notion that Plaintiff should be allowed more freedom than the ability
to change every half-hour. However, Dr. Pinelli offers no explanation for Plaintiff's need for
unlimited freedom. The RFC analysis is actually more favorable than Dr. Pinelli's opinion as
to lifting. Dr. Pinelli opines that Plaintiff could lift 20 pounds occasionally while the ALJ's
limitation in the RFC is to five pounds occasionally. (Tr. at 648, 990). Both the ALJ and Dr.

---

[2] The reference to Dr. Pinello appears to be a typographical error since he is spoken of as Dr. Pinelli in the administrative record.

Pinelli would allow fine manipulation with both right and left upper extremities (Tr. at 648, 990). Accordingly, the RFC is largely consistent with Dr. Pinelli's opinion of August 2012. To the extent the RFC departs from Dr. Pinelli's opinion, I suggest that Dr. Pinelli's reliance on the diagnoses of cervical disc disease, knee pain, and carpal tunnel syndrome as the "objective medical evidence to support [his] diagnosis and findings" is insufficient. (Tr. at 991). A list of diagnoses is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques[.]" 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. I therefore suggest that the ALJ properly discounted Dr. Pinelli's opinion that White should be able to rest and lie down whenever she desires.

Although Plaintiff argues that the ALJ failed to consider the combined effect of her various conditions, the ALJ expressly stated that he considered all of Plaintiff's impairments, alone and in combination. (Tr. at 617). "The ALJ is not required to incorporate all 'severe impairments' in her RFC assessment." *West v. Colvin*, No. 5:14-69-KKC, 2014 WL 7177925, at *4 (E.D. Ky. Dec. 6, 2014). Here, the ALJ properly considered all the evidence and incorporated only the limitations that he found were supported by the record. I suggest that the ALJ did not err.

Finally, I suggest that the ALJ's credibility determination is also supported by substantial evidence. The ALJ thoroughly considered the relevant factors in connection with the evidence of record, including Plaintiff's reported symptoms and found that the intensity, persistence, and limiting effects of Plaintiff's reported symptoms were not credible to the extent they are inconsistent with the RFC determination, which reflected the objective evidence. (Tr. at 619-25). As to her mental health impairment, although Plaintiff was

19

diagnosed with depression (Tr. at 780), there is no evidence that the condition was disabling. Plaintiff's treating physician noted that her socioeconomic status and financial factors were a large cause of her symptoms because of her "problems with job" and "no $ coming in presently" causing her "extreme stress" due to "feel[ing] harassed by superior" at work. (Tr. at 783, 978). In addition, Plaintiff's symptoms never required hospitalization or even intensive therapy. When examined by her physicians, White was consistently noted to be "oriented x3." (Tr. at 793, 795, 801, 826, 833, 836, 841, 851, 866, 994, 1004). White was also noted to have normal speech and thought processes, adequate judgment and an average IQ. (Tr. at 825-26).

As to physical issues, I suggest that none of Plaintiff's impairments, alone or in combination, could reasonably be expected to cause disabling symptoms. Although Plaintiff suffered from carpal tunnel syndrome (Tr. at 917, 921, 922, 924), corrective surgery was successful and her "carpal tunnel symptoms have resolved." (Tr. at 996). As to her cervical spine issues, again surgery resulted in restored strength and sensation to her upper extremities. (Tr. at 822, 897, 902). Although Plaintiff later reported that "since surgery she has not had any improvement of her pain to the upper extremities" (Tr. at 998), x-rays taken that day showed post-surgical changes but "no real significant bony growth in the cages" and "good" alignment. (*Id.*). MRIs of the thoracic and cervical spine were "unremarkable" (Tr. at 1000-01), with only "marginal spurring bilaterally at C5-6 causing mild narrowing of the neural foramina" in the cervical spine. (Tr. at 1002). As to shoulder pain, Dr. Siatczynski reviewed the results of an MRI of White's shoulder taken on December 16, 2010, and noted that he "d[id] not see any significant abnormalities." (*Id.*). On September 25, 2012, Dr. Donahue stated that "[w]ith

20

regard to the anatomy of her spine, it appears to be satisfactory and we suggest other etiologies of her pain." (Tr. at 1004).

Considering Plaintiff's mental and physical impairments, the modest treatment Plaintiff received also supports the ALJ's findings since such modest treatment is inconsistent with a finding of disability. *See Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1001 (6th Cir. 2011); *Myatt v. Comm'r of Soc. Sec.*, 251 F. App'x 332, 334-35 (6th Cir. 2007). I therefore suggest that substantial evidence supports the ALJ's credibility finding that none of Plaintiff's impairments, alone or in combination, could reasonably be expected to cause the alleged disabling symptoms.

### G.    Conclusion

For the reasons stated above, the Court **RECOMMENDS** that White's Motion for Summary Judgment (Doc. 19) be **DENIED**, the Commissioner's Motion (Doc. 22) be **GRANTED**, and that this case be **AFFIRMED**.

### III.    <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some

objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  July 30, 2015                          S/ PATRICIA T. MORRIS
                                              Patricia T. Morris
                                              United States Magistrate Judge

### CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: July 30, 2015                          By s/Kristen Krawczyk
                                             Case Manager to Magistrate Judge Morris